**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**

August 13, 2012

No. 09-40896

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff-Appellee

v.

KENNEDY PAUL POLIDORE,

Defendant-Appellant

Appeals from the United States District Court
for the Eastern District of Texas

Before GARZA, CLEMENT, and SOUTHWICK, Circuit Judges.

GARZA, Circuit Judge:

A jury found the defendant, Kennedy Polidore, guilty of possessing crack cocaine with the intent to distribute it. On appeal, Polidore contends that reversible error occurred when portions of two 911 calls were admitted into evidence. For the following reasons, WE AFFIRM.

**I**

On the night of Polidore's arrest, two anonymous 911 calls made by the same individual alerted the police to possible criminal activity. On the portion of the first 911 call that was played to the jury after other portions of the call had been redacted, the following colloquy took place, which started at 12:15 A.M.

No. 09-40896

Operator:  911, where is your emergency?  Sir, you're phone is cutting out.  You called about what?

Caller:  All of this drug activity over off Sweetgum?

Operator:  What address on Sweetgum?

Caller:  I'm not gon—Why would I tell you? I'm trying to be anonymous and get y'all to get these drug dealers from over here.

Operator:  Sir, I'm not giving your name out so give me the information so that I can send the officers to the right place, where you're at.

Caller:  It's a red PT Cruiser.  This guy is selling—

Operator:  Sir, give me the address.

Caller:  2505 Sweetgum.  All this traffic.

Operator:  Did you see his license plate number?

Caller:  It's—uh—I know it's a red PT Cruiser.  I—I can go back out there and get it, but I don't want him to know that—

Operator:  Okay, do you know his name?

Caller:  Kennedy Polidore.

Operator:  Do you know what kind of drugs he's selling?

Caller:  He's selling crack.

Operator:  Which apartment is he in right now?

Caller:  He don't even live out here.  He's just sitting on the steps.  He's running in and out, in and out.  People coming—

Operator:  What's he wearing tonight?

Caller:  Ma'am?

Operator:  What's he wearing tonight?

Caller:  He's got some green shorts on and a white t-shirt.  The car is sitting off of—uh—11th, yeah that's 11th, and—uh—Sweetgum.

On the portion of the second 911 that was played to the jury, the following colloquy took place, which began at 12:24 A.M.

Operator:  Phone line 911, where is your emergency?

Caller:  Hey, I was the one just called about the drug deal that's going down over here on Sweetgum.

Operator:  Yes, sir.

Caller:  Ok. He's got the dope in the side door panel.

Operator:  The dope's in the side door panel?

Caller:  Yeah. He—the—

Operator:  The right or the left side?

2

No. 09-40896

| | |
|---|---|
| Caller: | Uh—of the driver's side—And—but I want them to do it when they leave here 'cause he's for sure got it in the car 'cause he didn't know I was the one called 'cause I the only one seen it. |
| Operator: | Okay, how did you see it sir? |
| Caller: | I seen him put it in there. I can see it right now. |
| Operator: | Okay, I'm adding the information to the call. Thank you, sir. |
| Caller: | Okay. But would you tell them not to do it here? Cause I don't want him to think that I was the one told (inaudible) pulls off going down the street. |
| Operator: | Ok. |
| Caller: | Thank you. |
| Operator: | You're welcome. |

The two responding police officers later testified that on the night in question they received a call via radio dispatcher requesting that they respond to the Monterrey Apartments at 2505 Sweetgum in order to look for "a red PT Cruiser in the parking lot with a black male occupying the PT Cruiser who was in the apartment selling narcotics." When they arrived at the address given by the 911 caller, they observed a red PT Cruiser, which was parked, unoccupied, and had its driver's side window down. Because the dispatcher had informed the officers that the suspect was keeping some of the narcotics inside a compartment on the driver's side of the vehicle, they looked from outside the vehicle and observed what appeared to be three rocks of crack cocaine in plain view.

The officers further testified that a man then approached them, identified himself as the 911 caller, and provided them with some information about the suspect and the PT Cruiser. Believing that the suspect would return to the unoccupied car, the officers devised a plan whereby one would hide behind a nearby fence and the other would drive the patrol unit around the corner. About five minutes later, a black male, dressed in dark-colored shorts and a white t-shirt, exited the apartment complex and entered the PT Cruiser on the driver's side; a female entered the vehicle on the passenger's side. The officer behind the fence alerted the officer in the patrol unit via a call on his cell phone. The officer

3

No. 09-40896

in the patrol unit returned to the apartment parking lot, activated his emergency lights, and followed the PT Cruiser. Once the officer activated his emergency equipment, the driver of the PT Cruiser accelerated to speeds of 60 to 65 miles per hour before failing to negotiate a turn and ending up in a vacant lot. As he was running up to the vehicle, the officer saw the driver's side door open and the driver stick his arm out and throw something underneath the vehicle. The driver identified himself as Kennedy Polidore and the officer took him into custody. After the officer handcuffed Polidore, he discovered what turned out to be a clear bag of powder cocaine on the driver's side floorboard. The officer also retrieved three rocks of crack cocaine from the same place earlier observed, and once the car was moved by a wrecker, he discovered a clear bag of crack cocaine on the ground where the car previously stood.[1] The officers testified that, based on their training and experience, the bag of crack cocaine recovered from underneath the vehicle was a "large amount" and was consistent with distribution purposes.

Polidore was charged by indictment with one count of possession with intent to distribute five grams or more but less than 50 grams of a mixture or substance containing a detectable amount of cocaine base. The Government subsequently filed a notice and information of prior convictions for purposes of increased punishment provided by 21 U.S.C. §§ 841(b)(1)(B) and 851. The jury found Polidore guilty as charged. The district court sentenced him to 137 months of imprisonment, to be followed by eight years of supervised release. Polidore filed a timely notice of appeal.

## II

On appeal, Polidore claims that the district court erred by admitting the 911 recordings into evidence because the recordings contained testimonial

---

[1] At trial, a forensic scientist testified that the substances found in and underneath the car were cocaine base (0.63 grams and 19.57 grams) and cocaine hydrochloride (27.66 grams).

No. 09-40896

hearsay that violated his Sixth Amendment right to be confronted with the witnesses against him.  He asserts that the recordings were prejudicial and extremely harmful to his defense.  Polidore alternatively contends that even if the caller's statements were nontestimonial, the district court erred by admitting the 911 recordings because they contained hearsay that did not fall under any of the exceptions to the rule against hearsay.[2]

## A

By proper objection, Polidore preserved his claim of error that the admission of the 911 recordings violated his right to confrontation.  Accordingly, we review the alleged violation of the Confrontation Clause de novo, subject to a harmless error analysis.  *United States v. Bell*, 367 F.3d 452, 465 (5th Cir. 2004).

The Confrontation Clause of the Sixth Amendment provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  U.S. CONST. amend. VI.  The Clause "applies to 'witnesses' against the accused—in other words, those who 'bear testimony.'" *Crawford v. Washington*, 541 U.S. 36, 51 (2004) (citation omitted).  "'Testimony,' in turn, is typically '[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact,'" *id.* (citation omitted), a description which we have held "includes 'statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.'" *Brown v. Epps*, — F.3d —, 2012 WL 2401670, at *3 (5th Cir. June 27, 2012) (quoting *Crawford*, 541 U.S. at 52).  The

---

[2] Polidore also argues that his case should be remanded to the district court for resentencing under the Fair Sentencing Act of 2010.  However, Polidore was convicted and sentenced before the effective date of the FSA.  In *United States v. Doggins*, 633 F.3d 379, 384 (5th Cir. 2011), we held that the FSA does not apply retroactively to cases where sentencing occurred prior to the effective date of the Act.  Hence, Polidore's argument is foreclosed by circuit precedent.

No. 09-40896

Clause's reach is limited to testimonial statements and "in order for testimonial evidence to be admissible, the Sixth Amendment 'demands what the common law required: unavailability and a prior opportunity for cross-examination.'" *Michigan v. Bryant*, 131 S. Ct. 1143, 1153 (2011) (citation omitted).

Although the Supreme Court has declined to "spell out a comprehensive definition of 'testimonial,'" it has noted that "'at a minimum' it includes 'prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and . . . *police interrogations.*'" *Id.* (citation omitted) (emphasis added). However, "not all 'interrogations by law enforcement officers[]' are subject to the Confrontation Clause." *Id.* (internal citation omitted).[3] For instance, the Court has held that "interrogations solely directed at establishing the facts of a past crime, in order to identify (or provide evidence to convict) the perpetrator" fall squarely within the definition of testimonial hearsay. *Davis*, 547 U.S. at 826. By contrast, the Court has singled out interrogations by 911 operators as a form of interrogation that does not necessarily elicit testimonial statements. *Id.* at 827 ("A 911 call, on the other hand, and at least the initial interrogation conducted in connection with a 911 call, is ordinarily not designed primarily to 'establis[h] or prov[e]' some past fact, but to describe current circumstances requiring police assistance.").

To determine whether a particular interrogation produced testimonial hearsay, the Court has instructed us to determine "the primary purpose of the interrogation." *Bryant*, 131 S. Ct. at 1155. The Court has not "attempt[ed] to produce an exhaustive classification of all conceivable statements . . . in response to police interrogation[ ] as either testimonial or nontestimonial." *Davis*, 547 U.S. at 822. But the Court has held that the "basic objective of the

---

[3] We assume that the 911 operators in this case were acting as "agents of law enforcement when they conduct[ed the] interrogations of [the] 911 caller[]" in this case. *See Davis v. Washington*, 547 U.S. 813, 823 n.2 (2006).

No. 09-40896

Confrontation Clause . . . is to prevent the accused from being deprived of the opportunity to cross-examine the declarant about statements taken for use at trial." *Bryant*, 131 S. Ct. at 1155. Accordingly, the Court has directed that if the primary purpose of an interrogation is to create a record for trial, then its admission at trial is barred by the Confrontation Clause. *Id.* By contrast, "when a statement is not procured with a primary purpose of creating an out-of-court substitute for trial testimony[,]" it does not fall within the scope of the Clause, and "the admissibility of [the] statement is the concern of state and federal rules of evidence, not the Confrontation Clause." *Id.*

The Court has identified several factors we should consider when deciding whether the primary purpose of a police interrogation was to create an out-of-court substitute for trial testimony. Specifically, the Court has considered (1) whether the declarant "was speaking about events *as they were actually happening*, rather than 'describ[ing] past events,'" *Davis*, 547 U.S. at 827, (2) whether a reasonable person in the declarant's position would have believed that the declarant was facing an ongoing emergency, *see id.*; *see also Bryant*, 131 S. Ct. at 1157 & n.8, (3) whether "the nature of what was asked and answered," viewed objectively, "was such that the elicited statements were necessary to be able to resolve the present emergency, rather than simply to learn . . . what had happened in the past," *Davis*, 547 U.S. at 827, and (4) the level of formality of the interrogation. *Id.*

In this case, however, we cannot resolve this issue by mechanically applying the above factors. The interrogations in this case do not fit neatly into the categories contemplated by the limited holdings recently issued by the Supreme Court. Specifically, given the nature of the interrogations recently considered by the Court, it has been able to decide whether those interrogations elicited testimonial hearsay largely based on the existence of an ongoing emergency. *Bryant*, 131 S. Ct. at 1162 ("The existence of an emergency or the

7

No. 09-40896

parties' perception that an emergency is ongoing is among the most important circumstances that court must take into account in determining whether an interrogation is testimonial . . . ."). For instance, in *Davis* the Court was able to decide the two cases before it primarily by distinguishing between interrogations intended "to enable police assistance to meet an ongoing emergency" and those intended to "establish or prove past events potentially relevant to later criminal prosecution" in the absence of an ongoing emergency:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

547 U.S. at 822.

Here, however, we cannot decide whether the declarant's statements were testimonial based primarily on the existence *vel non* of an ongoing emergency.[4] Unlike the declarant's statements in *Bryant* or in the two cases decided in *Davis*, the primary purpose of the interrogations in this case was neither to "enable police assistance to meet an ongoing emergency" nor to "establish or prove past events potentially relevant to later criminal prosecution." *Id.* Rather, the primary purpose of the interrogation was to gather information necessary for the police to respond to a report of *ongoing* criminal activity. Although it does appear that the declarant contemplated that his call could lead to a later criminal prosecution, he was not making his statements "to *establish* or *prove past* events potentially relevant to later criminal prosecution." *Id.* (emphasis

---

[4] We similarly cannot decide this case based predominantly on whether a reasonable person in the declarant's position would have believed that there was an ongoing emergency during the interrogations. *See Bryant*, 131 S. Ct. at 1157 n.8.

added).  Acknowledging that we must apply the reasoning in the Supreme Court's recent precedents to this slightly different context, we conclude that the declarant's statements were not testimonial; under the totality of the circumstances, the primary purpose of the interrogation was not to create an out-of-court substitute for trial testimony.  *Bryant*, 131 S. Ct. at 1155.

We begin our analysis by considering whether the primary purpose of the 911 operators' interrogations was to "enable police assistance to meet an ongoing emergency," which would render the declarant's resulting statements nontestimonial.  *Davis*, 547 U.S. at 822; *see Bryant*, 131 S. Ct. at 1156 (same).  To make this primary purpose determination, "we objectively evaluate the circumstances in which the encounter occurs and the statements and actions of the parties."  *Bryant*, 131 S. Ct. at 1156.  First, we examine the objective facts regarding the "circumstances in which an encounter occurs—*e.g.*, at or near the scene of the crime versus at a police station, during an ongoing emergency or afterwards."  *Id.*  Then we objectively evaluate the "statements and actions of the parties" to determine "the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions and the circumstances in which the encounter occurred."  *Id.*

"The existence of an ongoing emergency [or the parties' perception of an ongoing emergency] is relevant to determining the primary purpose of the interrogation because an emergency focuses the participants on something other than 'proving past events potentially relevant to later criminal prosecution.'"  *Id.* at 1157 (citation omitted).  Instead, the parties' belief that there is an ongoing emergency "focuses them on 'end[ing] a threatening situation.'"  *Id.* (citation omitted).

Determining whether the parties believed that an emergency existed and was ongoing during an interrogation "is a highly context-dependent inquiry."  *Id.* at 1158.  When making this assessment, it is important to consider the "zone of

potential victims" presented by the relevant activity. *Id.* For cases "involving threats to public safety," our "assessment of whether an emergency that threatens the police and the public is ongoing cannot narrowly focus on whether the threat solely to the first victim has been neutralized because the threat to the first responders and public may continue." *Id.* (citations omitted). Similarly, "the duration and scope of an emergency may depend in part on the type of weapon employed." *Id.*; *see id.* at 1164 (noting, in a case involving a gun, "the implausibility, at least as to certain weapons, of construing the emergency to last only precisely as long as the violent act itself").

An objective evaluation of the circumstances in which the 911 interrogations occurred and the statements and actions of the parties leads us to conclude that, at least by the time of the second 911 call, the primary purpose of the interrogation was not to enable police assistance to meet an ongoing emergency.

The objective circumstances of the two 911 interrogations entail an anonymous 911 caller reporting ongoing street-level drug trafficking to the police. According to the caller, Polidore was sitting on the steps of a nearby apartment complex, running in and out of the complex, and selling crack cocaine. The caller told the operator that Polidore "totes a gun," but there is no evidence suggesting that the caller knew the defendant was carrying a gun on the night in question.[5] The caller appears to have made the first call while inside a nearby building because he told the operator that he "could go back out there and get" Polidore's license plate number. Between the first and second calls, the caller appears to have gone outside and approached Polidore's car because he informed the second 911 operator that Polidore was storing the "dope" in "a side door panel," that he had seen Polidore put drugs in the door panel, and that he "could

---

[5] The portion of the first call containing this statement was not played to the jury.

see [the dope] right now." It is also worth noting that the City of Beaumont had imposed a curfew at the time of the calls due to a recent hurricane.

The Supreme Court has not applied its "ongoing emergency" analysis to a similar case: *i.e.*, where a 911 caller reports an ongoing drug trafficking crime and asks the police to come stop it. But we do not need to categorically analyze the circumstances under which a drug trafficking crime can constitute an "ongoing emergency" in order to decide the issue in this case. Rather, although we note that similar circumstances could in some cases give rise to a 911 interrogation that has a primary purpose of enabling police assistance to meet an ongoing emergency, *see United States v. Ibarra-Sanchez*, 199 F.3d 753, 761 (5th Cir. 1999) (holding, in another context, that "[r]arely are concerns for officer safety more paramount than during the stop of a vehicle suspected of transporting drugs"), the statements and actions of the 911 caller during the second call dispel any notion that, by that time, the primary purpose of the interrogation was to enable police assistance to meet an ongoing emergency.

The Court has held that statements made on 911 calls are ordinarily not testimonial because "[a] 911 call . . . and at least the initial interrogation conducted in connection with a 911 call, is ordinarily not designed primarily to establish or prove some past fact, but to describe current circumstances requiring police assistance." *Davis*, 547 U.S. at 827 (internal quotation marks omitted). The Court qualified this holding, however, by concluding that where a declarant's "statements were neither a cry for help nor the provision of information enabling officers immediately to end a threatening situation, the fact that they were given at an alleged crime scene and were 'initial inquiries' is immaterial." *Id.* at 832.

Here, even if the caller's statements on the first 911 call were responses to "initial inquiries" that were necessary to inform the responding officers what they needed to know in order to "assess the situation, the threat to their own

safety, and possible danger to the [public]," the caller's statements on the second call were "neither a cry for help nor the provision of information enabling officers *immediately* to end a threatening situation." *Id.* (emphasis added); *see id.* at 828 (holding that the primary purpose of an interrogation can evolve once the initial purpose has been achieved).

For instance, during the second call, the caller asked the operator on two occasions to tell the police not to arrest Polidore until he left his location near the apartment complex.[6] Although the caller's request to allow Polidore to leave the area before his arrest reflects an understandable desire to remain anonymous, it also shows that the caller was not requesting *immediate assistance to end a threatening situation.* When a 911 interrogation "elicit[s] statements . . . necessary to be able to *resolve* [a] present emergency," *Davis*, 547 U.S. at 827, the 911 caller does not ask the operator to tell the police to wait to arrest a suspect until he voluntarily leaves the scene of the reported activity. *Cf. United States v. Thomas*, 453 F.3d 838, 844 (7th Cir. 2006) (holding that a 911 caller's statements were nontestimonial when the caller stated that "[t]here is somebody shot outside, somebody needs to be sent over here, and there's somebody runnin' around with a gun, somewhere"); *United States v. Arnold*, 486 F.3d 177, 189 (6th Cir. 2007) (en banc) ("The fear that the district court noted in Gordon's voice communicated that she was scarcely concerned with testifying to anything but simply was seeking protection from a man with a gun who had killed before and who had threatened to kill again."). Moreover, the fact that the 911 caller placed a second call to the operator only to inform the police that Polidore was storing drugs in a door panel of his vehicle further establishes that,

---

[6] The caller stated: (1) "But I want [the police] to do it when they leave here because he's for sure got it in the car because he doesn't know that I was the one that called because I was the only one seen it[;]" and (2) "[b]ut would you tell [the police] not to do it here? Cause I don't want him to think that I was the one told when he pulls off going down the street."

No. 09-40896

by the time of the second call, the primary purpose of the interrogation had evolved beyond the information "needed to address the exigency of the moment." *Davis*, 547 U.S. at 828 (citation omitted).

In sum, an objective examination of the 911 caller's "statements and actions" does not indicate that "the primary purpose of the interrogation" was to "enable police assistance to meet an ongoing emergency." *Bryant*, 131 S. Ct. at 1156 (internal quotation marks and citation omitted). In particular, the caller's statements and actions during the second 911 call reveal that "the information [he] knew at the time of the [call] would [not have led] a reasonable person to believe that there was an emergency," as the Supreme Court has presently defined the term. *Id.* at 1157 n.8. Between the first and the second call, the caller appeared to have (1) moved to a location where he could see Polidore place drugs in a side door panel of his car and then (2) approached Polidore's vehicle to a position where he could see the drugs in the side door panel.[7] As stated previously, the caller asked the operator on two occasions during the second call to wait to arrest Polidore until he left the apartment complex. The caller's willingness to approach the reported activity and to allow it to continue until Polidore voluntarily drove away from the complex indicates that a reasonable person in his position would not have thought that the situation constituted an emergent threat to himself, the public, or responding officers. *See id.* at 1158 ("An assessment of whether an emergency that threatens the police and public is ongoing cannot narrowly focus on whether the threat solely to the first victim has been neutralized because the threat to the first responders and public may continue."); *id.* ("[W]hether an emergency exists

---

[7] The caller stated, "[h]e's got the dope in the side door panel." He then asked the police to wait to arrest Polidore until he left the scene, explaining "he's for sure got it in the car 'cause he didn't know I was the one called 'cause I the only one seen it." When the operator asked the caller how he was able to see the drugs, the caller responded, "I seen him put it in there. I can see it right now."

13

and is ongoing is a highly context-dependent inquiry.") (citation omitted). Accordingly, we conclude that the primary purpose of the 911 operator's interrogation, at least during the second 911 call, was not "to enable police assistance to meet an ongoing emergency." *Davis*, 547 U.S. at 822.

However, this conclusion is not "dispositive of the testimonial inquiry." *Bryant*, 131 S. Ct. at 1160; *see id.* ("[W]hether an ongoing emergency exists is simply one factor—albeit an important factor—that informs the ultimate inquiry regarding the 'primary purpose' of an interrogation."). In *Bryant*, the Court specifically noted that "there may be *other* circumstances, aside from ongoing emergencies, when a statement is not procured with a primary purpose of creating an out-of-court substitute for trial testimony." *Id.* at 1155. We conclude that the 911 caller's statements in this case were primarily procured for such a purpose.

Here, the declarant called 911 to report *ongoing* street-level drug trafficking and to request that the police be dispatched to arrest Polidore while he had crack cocaine in his possession. Thus, unlike the interrogations in *Crawford* and *Hammon*,[8] which produced testimonial statements, the declarant in this case was not "describing *past* events."[9] *Davis*, 547 U.S. at 827 (citation omitted) (emphasis added); *see Hammon*, 547 U.S. at 829 (holding that "[i]t is entirely clear from the circumstances that the interrogation was part of an investigation into possibly criminal past conduct"); *id.* at 830 (distinguishing the interrogation in *Hammon* from that in *Davis* because the interrogator in *Hammon* "was not seeking to determine (as in *Davis*) 'what is happening,' but rather 'what happened'"). The primary purpose of the 911 interrogations in this

---

[8] In *Davis*, the Court also decided *Hammon v. Indiana*, 547 U.S. 813, 829–32 (2006).

[9] This is true at least for the portions of the calls that were played to the jury. In portions of the calls redacted from the recordings that were played to the jury the caller referred to prior crimes of the defendant.

No. 09-40896

case was not "to establish or prove past events potentially relevant to later criminal prosecution." *Id.* at 822. Accordingly, the fact that the 911 calls were "neither a cry for help nor the provision of information enabling officers immediately to end a threatening situation," does not necessarily render the declarant's statements testimonial. *Cf. Bryant*, 131 S. Ct. at 1154–55 (internal quotation marks and citation omitted).

Thus, to decide this issue, we must consider the circumstances under which a 911 interrogation involving reported ongoing criminal activity, absent an ongoing emergency,[10] has a "primary purpose of creating an out-of-court substitute for trial testimony." *Id.* at 1155. However, we need not categorically address the standards that should apply in such cases in order to determine that the primary purpose of the 911 interrogations in this case was not to create a substitute for trial testimony. Specifically, given the nature of the ongoing criminal activity and the caller's request for assistance from the police, a reasonable person in the caller's position would not have thought that his statements were creating an out-of-court substitute for trial testimony. *See Brown*, — F.3d —, 2012 WL 2401670, at *3 (holding that testimonial statements include statements made under circumstances "which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial").

As an initial matter, we determine that the nature of the reported ongoing criminal activity is relevant to determining the primary purpose of the interrogation. Here, the nature of the reported ongoing criminal

---

[10] We note that our conclusion that these circumstances did not present an "ongoing emergency" is based on the Court's current precedents, which may be subject to change. *See Williams v. Illinois*, 132 S. Ct. 2221, 2242 n.13 (2012) (noting, when discussing the Court's post-*Crawford* precedents that, "[e]xperience might yet show that the holdings in those cases should be reconsidered for the reasons, among others, expressed in the dissents the decisions produced[;] [t]hose decisions are not challenged in this case and are to be deemed binding precedents, but they can and should be distinguished on the facts here").

No. 09-40896

activity—possession with intent to distribute—was such that the police could obtain sufficient evidence to establish Polidore's guilt simply by responding to the call and pulling him over while he was in possession of a "large amount" of crack cocaine. *United States v. Kaufman*, 858 F.2d 994, 1000 (5th Cir. 1988) (holding that possession with intent to distribute can be proved based on a defendant's possession of "a larger quantity than an ordinary user would possess for personal consumption"); *see United States v. Hernandez-Beltran*, 867 F.2d 224, 226–27 (5th Cir. 1989) (same). Under these circumstances, a reasonable person in the 911 caller's position would have concluded that his statements were not being prepared for use at trial: either the police would promptly respond and arrest Polidore with a significant amount of crack cocaine in his possession, thereby giving the authorities sufficient evidence to convict the defendant of a crime without the caller's statements, or the police would not arrive in time to arrest Polidore and the caller's statements would have been of little use. We do not mean to suggest that the caller knew the elements of the charged offense, but the caller in this case clearly understood that the police's arrest of Polidore in possession of a "large amount" of crack cocaine would be sufficient to prove a criminal offense. In sum, due to the nature of the reported criminal activity—an ongoing possession offense—a reasonable person in the caller's position would not have thought that his statements (a) reporting ongoing street-level drug trafficking to 911 and (b) asking that the police be promptly dispatched to ensure Polidore's arrest while in possession of crack cocaine, were being taken as an "out-of-court substitute for trial testimony." *Bryant*, 131 S. Ct. at 1155.[11]

---

[11] Contrary to the dissent's assertion, we have not "all but declared an end to Confrontation Clause applicability to declarations that report ongoing crimes." Dissent at 2. Instead, our holding is limited to statements where a declarant requests immediate police assistance to stop an ongoing crime whose nature is such that a reasonable person would not have thought that his statements were being taken as an "out-of-court substitute for trial

No. 09-40896

Moreover, although the Court implied in *Davis* that a 911 call "provid[ing] a narrative report of a crime absent any imminent danger" would yield testimonial statements, 547 U.S. at 827, the calls in this case do not meet that description. The 911 caller did not merely provide a narrative report of the crime "for the purpose of establishing or proving some fact." *Bryant*, 131 S. Ct. at 1153 (citation omitted). Rather, the caller reported an ongoing drug trafficking crime to the police, gave the police the requisite information to stop that offense, and asked for the police to be promptly dispatched to stop the crime as it continued. *See United States v. Davis*, 666 F.2d 195, 199 (5th Cir. Unit B 1982) (holding that possession with intent to distribute is a continuing offense). Although the situation did not present an "ongoing *emergency*," the caller was nevertheless "seeking aid, not telling a story about the [present] or the past." *Davis*, 547 U.S. at 828, 831 (emphasis added).[12]

An objective analysis of the statements of the 911 operators and the statements and actions of the caller confirm that the purpose of the interrogation was not to elicit statements for use at trial. *Bryant*, 131 S. Ct. at 1155. The questions posed by the 911 operators reflect an intent to gather the information responding officers would need to investigate and, if necessary, stop reported ongoing street-level drug trafficking; the operators' questions were not intended "simply to learn (as in *Crawford*) what had happened in the past," nor posed in a manner that the caller would "necessarily ha[ve] prosecution in mind when []he answer[ed]." *Id.* at 1160–61 (citation omitted).

---

testimony." *Id.*

[12] To be sure, certain statements made by the 911 caller did concern past criminal activity committed by Polidore. However, the district court properly redacted those portions of the calls and did not play them at trial. *See Davis*, 547 U.S. at 829 (noting that courts "should redact or exclude the portions of any statement that have become testimonial").

Similarly, although the 911 caller appeared to have understood that his comments would start an investigation that could lead to a criminal prosecution, the primary purpose of his statements was to request police assistance in stopping an ongoing crime and to provide the police with the requisite information to achieve that objective. Like a statement made to "resolve an ongoing emergency," the caller's "purpose [was] not to provide a solemn declaration for use at trial, but to bring to an end an ongoing [drug trafficking crime]," *Williams v. Illinois*, 132 S. Ct. 2221, 2243 (2012) (citing *Bryant*, 131 S. Ct. at 1155), even though the crime did not constitute an "ongoing emergency." *See id.* The 911 caller "simply was not acting as a witness; []he was not testifying. What []he said was not 'a weaker substitute for live testimony' at trial." *Davis*, 547 U.S. at 828 (citation omitted). In other words, the caller's statements were not "*ex parte* communication[s]" that created "evidentiary products" that "aligned perfectly with their courtroom analogues." *Id.* As in *Davis*, "[n]o 'witness' goes into court" to report that a man is currently selling drugs out of his car and to ask the police to come and arrest the man while he still has the drugs in his possession. *See id.* ("No 'witness' goes into court to proclaim an emergency and seek help."); *see also United States v. Brun*, 416 F.3d 703, 707 (8th Cir. 2005) ("A 911 call is usually made because the caller wants protection from an immediate danger, not because the 911 caller expects the report to be used later at trial with the caller bearing witness—rather, there is a cloak of anonymity surrounding 911 calls that encourages citizens to make emergency calls and not fear repercussion.") (citation omitted).[13]

---

[13] We also conclude that the relative informality of the two interrogations supports our holding that the caller lacked testimonial intent. *Bryant*, 131 S. Ct. at 1160. The questioning occurred before the police arrived and proceeded in a relatively "disorganized fashion," as the caller interrupted the operators' questions to (a) provide additional information and (b) attempt to ensure that the police would not arrest Polidore until after he left the apartment complex. These facts "make this case distinguishable from the formal station-house interrogation in *Crawford*." *Id.* (citation omitted).

No. 09-40896

The dissent, citing one of our sister circuits and an influential commentator, contends that statements made to the authorities with a full understanding that the authorities will use them to investigate and prosecute a crime are testimonial, regardless of whether those statements concern an ongoing or past crime. Dissent at 2; *see United States v. Cromer*, 389 F.3d 662, 674 (6th Cir. 2004) (holding that "[s]tatements 'made to the authorities who will use them in investigating and prosecuting a crime, . . . made with the full understanding that they will be so used,' are precisely the sort of accusatory statements the Confrontation Clause was designed to address") (quoting Richard D. Friedman, *Confrontation: The Search for Basic Principles*, 86 GEO. L.J. 1011, 1025 (1998)). That may well be a useful general standard to employ when considering whether a given statement to authorities was testimonial. *Bryant*, 131 S. Ct. at 1166 (noting that certain circumstances can render a statement testimonial if the declarant was "focused . . . on the possible future prosecutorial use of his statements").

Under the limited circumstances of this case, however, we conclude that the caller's statements were nontestimonial even if the caller clearly understood that his call would "initiate investigative and prosecutorial machinery." *United States v. Hadley*, 431 F.3d 484, 506 n.17 (6th Cir. 2005) (citation omitted). As we have previously discussed, the declarant (1) called 911 to report that Polidore was selling drugs while sitting on the steps of an apartment building and storing the drugs in his car, (2) asked the operator to dispatch the police to arrest Polidore while he was still in possession of crack cocaine, and (3) asked the operator to tell the police not to arrest Polidore until he voluntarily drove down the street. A reasonable person in the caller's position would not have thought his statements were being prepared for use at trial; thus, we conclude that the

No. 09-40896

primary purpose of the 911 calls was not to create an out-of-court substitute for trial testimony. *Bryant*, 131 S. Ct. at 1155.[14]

Accordingly, the 911 caller's statements did not constitute testimonial hearsay, and the admissibility of the statements was "the concern of . . . federal rules of evidence, not the Confrontation Clause." *Id.*

**B**

Polidore also objected to the 911 recordings at trial on the grounds that they contained hearsay; accordingly, we review the court's decision to admit the recordings over his objection for an abuse of discretion. *United States v. Watkins*, 591 F.3d 780, 786 (5th Cir. 2009).

Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." *Id.* (citation omitted); *see* FED. R. EVID. 801 (defining hearsay). "Testimony not used to establish the truth of the assertion . . . 'does not fall under the proscriptions against the use of hearsay.'" *Watkins*, 591 F.3d at 786 (quoting *United States v. Vizcarra–Porras*, 889 F.2d 1435, 1439 (5th Cir. 1989)).[15]

---

[14] Contrary to the dissent's assertion, we do not hold that a statement is "nontestimonial solely on the basis that it prompts police action." Dissent at 2. Rather, the nature of the reported ongoing criminal activity and the fact that the caller asked the police to immediately respond to end the ongoing offense are critical components of our analysis.

We also do not intend to "accelerat[e] the dismantling of *Crawford*." *Id.* at 1. Instead, we have merely applied the reasoning from the Supreme Court's recent precedents interpreting the Confrontation Clause to a different context.

[15] Similarly, we note that "the Confrontation Clause 'does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted.'" *Williams*, 132 S. Ct. at 2235 (quoting *Crawford*, 541 U.S. at 59–60 n.9); *see United States v. Holmes*, 406 F.3d 337, 349 (5th Cir. 2005) (same). "Instead, to constitute a Confrontation Clause violation, 'the statement must be used as hearsay—in other words, it must be offered for the truth of the matter asserted.'" *United States v. Davis*, 577 F.3d 660, 670 (6th Cir. 2009) (citations omitted); *see Williams*, 132 S. Ct. at 2228 (holding that an expert's "testimony d[id] not violate the Confrontation Clause because that provision has no application to out-of-court statements that are not offered to prove the truth of the matter asserted").

No. 09-40896

Federal Rule of Evidence 802 bars hearsay testimony unless a federal statute, the Federal Rules of Evidence, or other rules prescribed by the Supreme Court provide otherwise.[16]  *See United States v. Moore*, 748 F.2d 246, 248 (5th Cir. 1984) ("Hearsay is generally inadmissible unless it fits within one of the exceptions listed in Fed. R. Evid. 803 and 804.") (citation omitted).

At trial, the district court overruled Polidore's hearsay objection, finding that the statements in the 911 calls were being offered for what prompted the officers to go to the location and investigate in the first place, not for the truth of the matter asserted.  The district court alternatively found that the statements, if hearsay, were admissible as an excited utterance or as a statement of the caller's then existing mental, emotional, or physical condition. *See* FED. R. EVID. 803(2),(3).

On appeal, the Government maintains that the 911 calls were not offered for the truth of the matter asserted but instead to "explain the dispatch of the officers to Polidore's location, their focus on the PT Cruiser, the subsequent discovery of crack cocaine, their willingness to talk to a person on the scene that identified himself as the caller, and their belief that the suspect would return to the PT Cruiser."  Alternatively, the Government asserts that the present-sense impression exception to the hearsay rule applies because the statements in the 911 calls "were made contemporaneous[ly] with the caller's observations of the events that he reported to the dispatcher" and because "the scene of the crime was consistent with that information."

We need not address whether the Government offered the caller's statements for the truth of the matter asserted because we conclude that even

---

[16]  We note that "[a] new version of the Federal Rules of Evidence went into effect on December 1, 2011 as part of the Federal Rules Style Project." *See United States v. Jean-Guerrier*, 666 F.3d 1087, 1091 n.2 (8th Cir. 2012).  Because changes made under the project "are intended to be stylistic only," *see* FED. R. EVID. 801–803 advisory committee's note, we will quote the new version of the Rules.

if they were hearsay, the statements fell within the present sense impression exception to the rule against hearsay.[17]   Rule 803(1) provides that hearsay statements "describing or explaining an event or condition, made while or immediately after the declarant perceived it," "are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness." FED. R. EVID. 803(1).   The basis for this hearsay exception "relies on the contemporaneousness of the event under consideration and the statement describing that event.   Because the two occur almost simultaneously, there is almost no 'likelihood of [a] deliberate or conscious misrepresentation.'" *Rock v. Huffco Gas & Oil Co.*, 922 F.2d 272, 280 (5th Cir. 1991) (citations omitted).

Here, the caller made his statements to 911 as he was observing Polidore's actions or shortly thereafter.   For instance, less than ten minutes after placing the first call, the caller observed Polidore place drugs in a side door panel of his vehicle and placed a second call while he was still observing the drugs "right now."   Because (1) the caller's statements described and explained events that he personally witnessed and (2) the caller made the statements contemporaneously with his observation of the events—*i.e.*, while he was observing the events or very soon thereafter—we hold that the statements were admissible as present sense impression under Rule 803(1).   *Id.* (citations omitted); *see United States v. Jackson*, 204 F.3d 1118, 1999 WL 1330689, at *8 (5th Cir. Dec. 17 1999) (unpublished) (holding that a district court did not commit reversible error by admitting a tape and transcript of 911 calls, which

---

[17] However, we note that as a practical matter, the 911 recordings were admitted for all purposes in front of the jury: that is, the jury was never informed of the limited purpose for which the Government intended to offer the recordings.  Defense counsel never requested that the jury be so informed or requested that the district court give the jury a limiting instruction under Federal Rule of Evidence 105.  *See Savoie v. Otto Candies, Inc.*, 692 F.2d 363, 370 (5th Cir. 1982) (holding that when a party fails to request a Rule 105 limiting instruction, "simply having taken the position that the evidence was admissible for no purpose whatever and the jury should be instructed to totally disregard it for any purpose[,] [a]ny error in this regard was accordingly waived") (internal citation omitted).

were made seconds after the callers escaped from the trunk of a car, and the Government had argued, in part, that the calls contained present sense impressions).[18]

Accordingly, we conclude that the district court did not abuse its discretion by admitting the 911 calls into evidence.[19]

### III

For the foregoing reasons, both the conviction and sentence are AFFIRMED.

---

[18] We note that Polidore could have claimed on appeal that the district court erred by admitting the 911 recordings because their probative value was substantially outweighed by a danger of unfair prejudice pursuant to Federal Rule of Evidence 403. Because the 911 recordings directly implicated him in the alleged crimes, Polidore could have potentially argued that the district court's decision to admit the evidence constituted reversible error. *See United States v. Carrillo*, 20 F.3d 617, 620 (5th Cir. 1994) ("The more directly an out-of-court declaration implicates the defendant, the greater the danger of prejudice. Conversely, when the statement does not directly implicate the defendant, the probative value outweighs the prejudicial effect.") (citations omitted). But although Polidore raised an objection under Rule 403 at trial, he has failed to brief such a claim on appeal, thereby waiving it. *See McGowan v. Thaler*, 675 F.3d 482, 498 (5th Cir. 2012) (holding that unbriefed issues are waived).

[19] Polidore has also filed, *pro se*, a motion for the court to consider whether he was denied the right to counsel of his choice in the district court. However, we deny Polidore's *pro se* motion as unauthorized. *See* 5TH CIR. R. 28.6 ("Unless specifically directed by court order, *pro se* motions, briefs or correspondence will not be filed if the party is represented by counsel.").

No. 09-40896

Leslie H. Southwick, Circuit Judge, dissenting:

I agree with the majority that Confrontation Clause guidance from the Supreme Court is undergoing change. Where I disagree is that I believe we should not reach a conclusion that reduces the protections of the Sixth Amendment further than the Court has thus far permitted. The majority is accelerating the dismantling of *Crawford v. Washington*, 541 U.S. 36 (2004). That is neither our role nor a desirable result.

The majority extends the ruling of the Supreme Court in *Michigan v. Bryant*, 131 S. Ct. 1143, 1160 (2011). "[T]he statements and actions of both the declarant and interrogators provide objective evidence of the primary purpose of the interrogation." *Bryant*, 131 S. Ct. at 1160. Polidore argues that the primary purpose of the telephone caller's statements was testimonial because the caller wanted police to stop "all this drug activity." The defendant also argues that "[t]he inquiry by the operator as to who is selling drugs and the type of drug is only relevant to later criminal prosecution." *See Davis v. Washington*, 547 U.S. 813, 822 (2006).

The declarant had witnessed frequent drug dealing. His statements taken in context of the entire 911 call suggested an intent to further a later criminal prosecution. For example, the declarant stated he was "trying to be anonymous and get you all to get these drug dealers from over here."[1] The declarant's primary purpose may have been stopping "all this drug activity over off Sweetgum" by having the defendant arrested without the declarant's needing to identify himself. It is not enough that the 911 operator wanted to assess the situation and obtain as much information as possible about Polidore. The operator was aiding the first responders. *Bryant*, 131 S. Ct. at 1161. The declarant's motives, not those of the operator, create the problem here.

---

[1] This part of the call was not played for the jury.

24

"Statements 'made to the authorities who will use them in investigating and prosecuting a crime, . . . made with the full understanding that they will be so used,' are precisely the sort of accusatory statements the Confrontation Clause was designed to address." *United States v. Cromer*, 389 F.3d 662, 674 (6th Cir. 2004) (quoting Richard D. Friedman, *Confrontation: The Search for Basic Principles*, 86 Geo. L. J. 1011, 1025 (1998)) (omission in original). "One can imagine the temptation that someone who bears a grudge might have to volunteer to police, truthfully or not, information of the commission of a crime, especially when that person is assured he will not be subject to confrontation." *Id.* at 675. The majority rejects the application of this rationale on the basis that the declarant knew his call would prompt police action. Yet surely that is the usual reason for 911 calls. I read *Davis* to require more than a call "to provide a narrative report of a crime absent any imminent danger"; what that opinion relied on was the fact the "call was plainly a call for help against bona fide physical threat." *Davis*, 547 U.S. at 827. The majority reads more recent caselaw to reject this guidance. I would not.

The majority has taken from *Bryant* a holding that the lack of an ongoing emergency does not make a declarant's statement *per se* testimonial, and all but declared an end to Confrontation Clause applicability to declarations that report ongoing crimes. While I agree that *Bryant* requires we look at more than the absence of an ongoing emergency, I do not see a basis for finding a statement nontestimonial solely on the basis that it prompts police action. Indeed, this caller gave some indications of his animus specifically towards Polidore and towards drug dealers generally. Confrontation is the constitutional protection defendants have to explore known and unknown motives. With respect, I believe the majority errantly removes that needed protection here.