UNITED STATES, Appellee

v.

Andrew D. TEARMAN, Lance Corporal
U.S. Marine Corps, Appellant

No. 12-0313

Crim. App. No. 201100195

United States Court of Appeals for the Armed Forces

Argued October 23, 2012

Decided March 19, 2013

RYAN, J., delivered the opinion of the Court, in which
ERDMANN and STUCKY, JJ., and EFFRON, S.J., joined.  BAKER,
C.J., filed a separate opinion concurring in part and in
the result.


Counsel

For Appellant:  Captain Michael D. Berry, USMC (argued);
Captain Jason Wareham, USMC.

For Appellee:  Major William C. Kirby, USMC (argued);
Colonel Kurt J. Brubaker, USMC, and Brian K. Keller, Esq.
(on brief).

Amicus Curiae for Appellant:  Captain Zaven T. Saroyan,
USAF (on brief) -- for the Air Force Appellate Defense
Division.

Military Judge:  Gregory L. Simmons


**THIS OPINION IS SUBJECT TO REVISION BEFORE FINAL PUBLICATION.**

United States v. Tearman, 12-0313/MC

Judge RYAN delivered the opinion of the Court.

Contrary to his pleas, a panel of officer members sitting as a special court-martial convicted Appellant of a single specification of wrongfully using marijuana in violation of Article 112a, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 912a (2006). The adjudged and approved sentence provided for a bad-conduct discharge and reduction to E-1. The United States Navy-Marine Corps Court of Criminal Appeals (NMCCA) affirmed the findings and sentence as approved by the convening authority. United States v. Tearman, 70 M.J. 640, 645 (N-M. Ct. Crim. App. 2012).

We granted Appellant's petition for review to determine whether: (1) the admission of the chain-of-custody documents and internal review worksheets violated Appellant's right of confrontation under the Sixth Amendment; and (2) the admission of the official test result and certification contained in the DD Form 2624 in violation of the Confrontation Clause of the Sixth Amendment was harmless beyond a reasonable doubt.[1] Applying

---

[1] On March 23, 2012, we granted review of the following issues:

    I.    THE LOWER COURT HELD THAT THE ADMISSION, OVER APPELLANT'S OBJECTION, OF TWO PIECES OF TESTIMONIAL HEARSAY FOUND WITHIN THE DD FORM 2624 WAS HARMLESS ERROR BEYOND A REASONABLE DOUBT. BUT IT MISAPPLIED THE SWEENEY FACTORS AND DID NOT

United States v. Tearman, 12-0313/MC

the principles set forth in United States v. Sweeney, 70
M.J. 296 (C.A.A.F. 2011), United States v. Blazier (Blazier
II), 69 M.J. 218 (C.A.A.F. 2010), and United States v.
Blazier (Blazier I), 68 M.J. 439 (C.A.A.F. 2010), as well
as Supreme Court precedent, see Bullcoming v. New Mexico,
131 S. Ct. 2705 (2011); Melendez-Diaz v. Massachusetts, 557
U.S. 305 (2009); Davis v. Washington, 547 U.S. 813 (2006);
Crawford v. Washington, 541 U.S. 36 (2004), we agree with
the NMCCA that the chain-of-custody documents and internal
review worksheets at issue in this case are nontestimonial.
Tearman, 70 M.J. at 642-43.

Further, applying the balancing test set forth in
Delaware v. Van Arsdall, 475 U.S. 673, 684 (1986), we also
agree with the NMCCA that the error in admitting the
official test result and certification contained in the DD

---

CONSIDER THE BLAZIER II FACTORS IN ASSESSING
PREJUDICE.  DID THE LOWER COURT ERR IN HOLDING
THAT THE TESTIMONIAL HEARSAY DID NOT CONTRIBUTE
TO APPELLANT'S CONVICTION?

II.   THE LOWER COURT HELD THAT THE MILITARY JUDGE DID
NOT ABUSE HIS DISCRETION IN ADMITTING, OVER
APPELLANT'S OBJECTION, THE CHAIN-OF-CUSTODY
DOCUMENTS AND INTERNAL REVIEW WORKSHEETS BECAUSE
THEY WERE NON-TESTIMONIAL.  ARE THESE NON-MACHINE
GENERATED DOCUMENTS AND WORKSHEETS TESTIMONIAL?

United States v. Tearman, 71 M.J. 197 (C.A.A.F. 2012)
(order granting review).

Form 2624 was harmless beyond a reasonable doubt. Tearman, 70 M.J. at 645.

## I. FACTS

On July 7, 2010, Appellant was one of approximately forty-four Marines randomly selected to participate in a urinalysis. His urine sample was packaged and shipped with the other samples to the Navy Drug Screening Laboratory (NDSL), in San Diego, California, for forensic testing. Upon arrival, Appellant's urine bottle was assigned a unique laboratory accessing number (LAN). NDSL testing detected and confirmed the presence of tetrahydrocannabinol (THC), a marijuana metabolite, in an amount above the Department of Defense (DoD) cutoff level in Appellant's urine.

On July 16, 2010, the NDSL sent an electronic notification of Appellant's positive result to the Substance Abuse Coordination Officer (SACO) assigned to Appellant's squadron, Sergeant O'Neil (Sgt O'Neil). On October 5, 2010, trial counsel requested that the NDSL send the empty urinalysis bottle and "drug lab documentation" pertaining to Appellant's batch number, specimen number, and unique LAN. Thereafter, a single charge and specification for wrongful use of marijuana, in violation

of Article 112a, UCMJ, was referred to a special court-martial, to which Appellant pleaded not guilty.

Prior to trial, the Government submitted an exhibit that included the drug testing report prepared by the NDSL. The drug testing report included the DD Form 2624, other chain-of-custody documents, machine-generated data, and internal review worksheets, documenting the NDSL's urinalysis process.[2]

---

[2] The drug testing report was made up of the following:

Pages 1–2, 5, 7, 12–13, and 17–18 are all chain of custody documents for the appellant's urine bottle, urine sample ("aliquot") or the batch containing the appellant's aliquot. These documents all contain handwritten signatures or initials and date stamps indicating the handling of the bottle, urine aliquot, or batch within the laboratory during the testing process. Pages 3 and 4 are the specimen custody document, DD 2624, which contains numerous stamped entries indicating the chain of custody from collection through receipt at the NDSL. It also contains a certification block (block H) where a certifying official, "Tito R. Romero, Jr., Chemist", signs his name certifying that "[he is] a laboratory official, that the laboratory results indicated on this form were correctly determined by proper laboratory procedures, and they are correctly annotated". In block G of the form the notation "THC" appears next to appellant's LAN and his social security number. Pages 6, 11, and 19 are all internal review worksheets for the initial screen, rescreen, and confirmation tests, which list the batch number and the signatures of a technician, quality control reviewer, and initial and final laboratory certifying official. Pages 8–10, 14–16 and 20–34 are mostly machine generated annotations with corresponding time

The defense moved to exclude the drug testing report in its entirety because the report was "prepared in anticipation for use at trial," or, in the alternative, to exclude the non-machine-generated portions of the report. The military judge denied the motions, finding that the "entries including chain[-]of[-]custody notations made by technicians of the [NDSL] in the urinalysis lab report do not constitute testimonial statements within the scope of the confrontation clause" and "are potentially admissible under the business records exception."[3]

At trial, the Government called Andrea Kaminski, a supervisory forensic chemist and expert witness from the NDSL. The Government offered a portion of Ms. Kaminski's testimony for the purpose of laying the foundation for admitting the drug testing report as a business record under M.R.E. 803(6). When the Government offered the drug testing report into evidence, the defense asserted a continuing objection on Confrontation Clause grounds. The military judge again overruled the objection, finding that:

---

stamps and abbreviations.

Tearman, 70 M.J. at 642 n.6.

[3] Military Rule of Evidence (M.R.E.) 803(6) (providing an exception to the rule against hearsay for "[r]ecords of regularly conducted activity").

6

(1) the drug testing report was admissible in its entirety under United States v. Magyari, 63 M.J. 123 (C.A.A.F. 2006), because the testing was performed on "a random sample basis," under a "non-investigative urinalysis process;" and (2) "trial counsel has laid a proper foundation for [the drug testing report] under [M.R.E. 803(6)]." Thereafter, the drug testing report was admitted into evidence in its entirety.

Ms. Kaminski was trained and certified as an expert witness in the field of forensic science, and testified regarding the NDSL's mission, its process by which samples are accessioned, its testing methodology, and the contents of the drug testing report. Ms. Kaminski explained that the NDSL's THC testing process consisted of three independent tests:

> The first test is a screening test called immunoassay. If the sample from that first test is presumptive positive, we do a second test. It's called a rescreen immunoassay. And if that is presumptive positive, we do a third test called a confirmation GCMS [(gas chromatography mass spectrometry)] test.

Her expert opinion was that the urine sample associated with Appellant's LAN contained THC in an amount above the DoD cutoff limit.

Ms. Kaminski was specifically asked about the front side of the DD Form 2624, i.e., the "specimen custody

document." After reviewing the document and the official test result presented in block G, she stated that Appellant's specimen was positive for THC. Ms. Kaminski then testified about the NDSL's urinalysis process in detail, focusing on the laboratory's procedural steps for handling a positive sample and the machine-generated data produced in the course of testing Appellant's urine sample.[4]

First, Ms. Kaminski described the NDSL's process for the initial screening test. Then, based on the machine-generated screening results displayed on page eight of the drug testing report, she indicated that Appellant's sample tested above the DoD cutoff level for THC. Next, Ms. Kaminski testified about the process for the rescreening test. Again, relying on the machine-generated rescreening results contained on pages fourteen and fifteen of the drug testing report, she testified that Appellant's sample "tested presumptive positive for THC" and indicated that the sample tested above the DoD cutoff level for THC. Finally, Ms. Kaminski described the GCMS confirmation test. Once again, relying on the machine-generated test results

---

[4] Ms. Kaminski could not specifically testify about the accessioning, initial screening, or the rescreening processes with regard to Appellant's specimen because she was not present for those stages in the testing. She was, however, present for the GCMS confirmation test, which took place in her department.

on page thirty-one of the drug testing report, she concluded that Appellant's sample "tested positive for THC" and tested above the DoD cutoff level for THC.

The Government also called Sgt O'Neil, the SACO for Appellant's squadron, who testified about the process of collecting Appellant's urine sample, storing the sample, and shipping the sample to the NDSL. Sgt O'Neil identified his signatures on the chain-of-custody portion of the DD Form 2624. Sgt O'Neil testified that he signed the chain-of-custody document when he released the urine samples to storage, when he removed the samples from storage to prepare for shipping, and when he shipped the samples to the NDSL.

## II.  NMCCA DECISION

The NMCCA applied Sweeney and unanimously held that, except for blocks G and H on the DD Form 2624, the military judge did not err in admitting the drug testing report as a business record because the report's remaining statements were either (1) machine-generated, and thus nontestimonial, citing Blazier II, 69 M.J. at 224, or (2) lacked the attendant characteristics and formalities to suggest that they were "affirmation[s] made for the purpose of establishing or proving some fact in a criminal proceeding."  Tearman, 70 M.J. at 642-43 (alteration in

9

original) (quoting Bullcoming, 131 S. Ct. at 2716)
(internal quotation marks omitted).

In contrast, the NMCCA held that portions of the DD
Form 2624 -- i.e., the "official Department of Defense
specimen custody form used by the NDSL for certifying and
reporting urinalysis test results" -- were testimonial.
Id. at 643.  The NMCCA held that it was error to admit both
the NDSL's official test result -- block G on the DD Form
2624 -- and its certification "that the laboratory
results . . . were correctly determined by proper
laboratory procedures, and that they are correctly
annotated," -- block H on the DD Form 2624 -- noting that,
taken together, they "present a formalized, conclusory
affirmation, much like the certificates of the analysts in
Melendez-Diaz and Bullcoming, and identical to the
certification in Sweeney."  Id.  The NMCCA further held
that the admission of this testimonial hearsay over defense
objection was harmless beyond a reasonable doubt under Van
Arsdall, 475 U.S. at 684, because the erroneously admitted
evidence was "cumulative with, and ultimately corroborated
by, the testimony and independent opinion of the
Government's expert witness."  Tearman, 70 M.J. at 645.

10

III.  DISCUSSION

Appellant alleges that the NMCCA erred in holding that the chain-of-custody documents and internal review worksheets contained within the drug testing report were nontestimonial, and further argues that the admission of the testimonial statements contained in the DD Form 2624 was not harmless beyond a reasonable doubt.  We disagree.[5]

A.

Whether admitted evidence constitutes testimonial hearsay is a question of law reviewed de novo.  Blazier I, 68 M.J. at 441-42.  "[A] statement is testimonial if 'made

---

[5] Chief Judge Baker's discussion of the testimonial/nontestimonial nature of blocks G and H of the DD Form 2624, in the wake of Williams v. Illinois, 132 S. Ct. 2221 (2012) (plurality opinion), see United States v. Tearman, __ M.J. __ (15-17) (C.A.A.F. 2013) (Baker, C.J., concurring in part and in the result), is irrelevant to the issues before us.  Even assuming that Williams either stands for the holding or has the precedential value he asserts, that the DD Form 2624 certifications are testimonial was decided in Sweeney, 70 M.J. at 304 -- the continuing vitality of which is not raised by the granted issues.  See Tearman, 71 M.J. 197 (order granting review). Furthermore, the Government not only declined to challenge the NMCCA's holding that it was constitutional error to admit blocks G and H of the DD Form 2624, Tearman, 70 M.J. at 643, but also conceded that the DD Form 2624 is testimonial during oral argument, Audio recording of oral argument at 18:58, Tearman, __ M.J. __ (C.A.A.F. Oct. 23, 2012) (No. 12-0313), http://www.armfor.uscourts.gov/newcaaf/calendar/2012-10.htm#23 -- months after Williams was decided -- and instead focused its argument on the fact that the error was harmless beyond a reasonable doubt.

under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.'" Sweeney, 70 M.J. at 301 (quoting Blazier I, 68 M.J. at 442). "Asked another way, would it be reasonably foreseeable to an objective person that the purpose of any individual statement in a drug testing report is evidentiary?" Id. at 302. To make this determination, we treat "fine distinctions based on the impetus behind the testing and the knowledge of those conducting laboratory tests at different points in time" as relevant considerations, but not as dispositive factors. Blazier I, 68 M.J. at 442; see also Sweeney, 70 M.J. at 302 ("[T]he focus has to be on the purpose of the statements in the drug testing report itself, rather than the initial purpose for the urine being collected and sent to the laboratory for testing."). Moreover, "the formality" of a statement "is a factor to be considered" when determining whether the statement is testimonial. Sweeney, 70 M.J. at 303 n.13 (citing Bullcoming, 131 S. Ct. at 2717).

The language used by the Supreme Court to describe whether and why a statement is testimonial is far from fixed. Compare Bullcoming, 131 S. Ct. at 2714 n.6 (plurality opinion) ("To rank as 'testimonial,' a statement must have 'a primary purpose' of 'establish[ing] or

12

prov[ing] past events potentially relevant to later criminal prosecution.'" (alterations in original) (quoting Davis, 547 U.S. at 822)), with Melendez-Diaz, 557 U.S. at 311 ("Here . . . the affidavits [were] 'made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial' . . . ." (quoting Crawford, 541 U.S. at 52)), and Melendez-Diaz, 557 U.S. at 329 (Thomas, J., concurring) ("I continue to adhere to my position that 'the Confrontation Clause is implicated by extrajudicial statements only insofar as they are contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions.'" (quoting White v. Illinois, 502 U.S. 346, 365 (1992) (Thomas, J., concurring in part and concurring in the judgment))), and Davis, 547 U.S. at 826-28 (distinguishing "interrogations solely directed at establishing the facts of a past crime" -- which elicit testimonial statements -- from interrogations designed to enable law enforcement "to meet an ongoing emergency" -- which do not), and Crawford, 541 U.S. at 51 (offering one formulation of testimonial statements as "'material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants

13

would reasonably expect to be used prosecutorially'")
(citation omitted), and Crawford, 541 U.S. at 52
("Statements taken by police officers in the course of
interrogations are also testimonial under even a narrow
standard.").[6]  However, under any of the various
formulations of testimonial statements, neither the chain-
of-custody documents nor the internal review worksheets at
issue qualify.

    As an initial matter, we note that the challenged
internal chain-of-custody documents and internal review
worksheets[7] are substantially different from the DD Form

---

[6] We do not view Williams, 132 S. Ct. 2221, as altering
either the Supreme Court's or this Court's Confrontation
Clause jurisprudence and do not attempt to unravel
Williams's various opinions except to note that (1) there
was no majority support for any point but the result, see
Williams, 132 S. Ct. at 2265 (Kagan, J., with whom Scalia,
J., Ginsburg, J., and Sotomayor, J., joined, dissenting)
("Five Justices specifically reject every aspect of [the
plurality's] reasoning and every paragraph of its
explication."); id. at 2255 (Thomas, J., concurring in the
judgment) (concluding that the "statements lacked the
requisite formality and solemnity to be considered
testimonial for purposes of the Confrontation Clause," but
noting that he "share[s] the dissent's view of the
plurality's flawed analysis") (internal quotation marks
omitted), and (2) the plurality nonetheless understood its
conclusion that petitioner's Sixth Amendment confrontation
right was not violated to be "entirely consistent with
Bullcoming and Melendez-Diaz," id. at 2240 (plurality
opinion).

[7] The NMCCA described the chain-of-custody documents and
internal review worksheets in relevant part:

14

2624 certification in Sweeney and the cover memoranda in Sweeney and Blazier I.  With regard to the DD Form 2624 certification, we held that the statement was testimonial where it (1) was completed and signed by a laboratory official after all testing was complete, Sweeney, 70 M.J. at 299, (2) indicated that the sample tested positive for cocaine and codeine, id., and (3) certified that the "'laboratory results [on the DD Form 2624] were correctly determined by proper laboratory procedures, and that they are correctly annotated.'"  Id. at 304.  Additionally, we concluded that the cover memoranda certifications were testimonial where they (1) were generated in response to the command's request, and, like the DD Form 2624 certification, after all testing was complete, see Sweeney, 70 M.J. at 299; Blazier I, 68 M.J. at 442, (2) "identif[ied] the presence of an illegal drug and indicate[d] the quantity present," Blazier I, 68 M.J. at

---

These eight pages, containing a total of thirty-seven individual chain of custody entries, all list a stamped or handwritten name, a signature or initials, a date, and a stamped entry indicating the purpose for the change in custody within the NDSL. . . . The internal review worksheets only contain names, signatures, and dates.  None of the "comments" portions of these worksheets contain any notations.  Nor do they certify the accuracy of any test results or adherence to any testing protocol.

Tearman, 70 M.J. at 642-43.

15

443, and (3) "summarize[d] and digest[ed] voluminous data." Id.

In contrast, here, the process of creating the challenged statements was initiated without any external request, before Appellant was charged, and before all, or in the case of the chain-of-custody documents, any testing was complete. Cf. Sweeney, 70 M.J. at 299, 304. While it is true that the statements were admitted into evidence, whether a statement is testimonial is a determination made ab initio. See Sweeney, 70 M.J. at 301 (citing Bullcoming, 131 S. Ct. at 2717); id. at 302. The fact that a document is ultimately admitted at trial as part of a prosecution exhibit, does not prove a fortiori that it "would . . . be reasonably foreseeable to an objective person" that it was created for an evidentiary purpose. Sweeney, 70 M.J. at 302. The technicians' signatures and annotations on the documents at issue were made under circumstances, which, taken as a whole, establish that they were made for an administrative rather than an evidentiary purpose. Id.

In the first place, the NDSL's internal chain-of-custody and internal review documentation process began immediately upon receipt of the urine specimens from the shipping agent and prior to the initial screening test, and were prepared pursuant to internal procedures and not at

16

the request of law enforcement, the command, or prosecution.[8]  The entries and notations contained in the documents were made contemporaneously with a change in custody of the sample or a step in the testing process,[9] pursuant to the regular practice of the NDSL and in the regular course of conducting its business.  Cf. Blazier I, 68 M.J. at 442 (holding that the cover memorandum was testimonial where it "was prepared not only after the results reporting assistant knew that the specimens had tested positive for illegal substances, but also in response to the prior day's request by Appellant's command for such reports 'for court-martial use'").  Thus, when the laboratory technicians signed and annotated the internal chain-of-custody and internal review documents, they did so under circumstances which would lead an objective witness reasonably to believe that they did so to maintain internal control, not to create evidence for use at a later trial. Sweeney, 70 M.J. at 301.

---

[8] This is similarly true of Sgt O'Neil's initial entries in the chain-of-custody portion of the DD Form 2624, which were made (1) following a random, noninvestigative urinalysis, and (2) in the regular course of his duties as the urinalysis unit coordinator.

[9] For example, the signatures and date stamps on the chain-of-custody portion of the DD Form 2624 for July 7-8, 2010, match Sgt O'Neil's testimony regarding his handling of the urine specimens on those dates.

Second, none of the statements at issue summarize or certify "additional substantive information."[10]  Id. at 299; see also United States v. Rankin, 64 M.J. 348, 352 (C.A.A.F. 2007) (listing as one relevant factor "in distinguishing between testimonial and nontestimonial hearsay" whether the statement "involve[d] more than a routine and objective cataloguing of unambiguous factual matters").  Instead, the signatures and annotations in the chain-of-custody documents and internal review worksheets track the progress of the specimen bottle from the command to the NDSL and from person-to-person at the NDSL, and note the progress of the sample through the testing processes.[11] The NDSL's internal chain-of-custody documents and internal review worksheets appear to be little more than part and

---

[10] Like the laboratory technicians' signatures and annotations, Sgt O'Neil's signatures on the specimen chain-of-custody portion of the DD Form 2624 made no certification of "additional substantive information," beyond a verification of each custodial step for which he was responsible as the SACO assigned to Appellant's unit. Sweeney, 70 M.J. at 299.

[11] Ms. Kaminski's testimony demonstrates that, unlike the DD Form 2624 certification and cover memoranda, the signatures and annotations on the documents at issue offer very limited substantive information.  For example, when asked "[w]hat does the [initial screening review worksheet] tell us?"  Ms. Kaminski stated that "[i]t tells you the batch number, the drugs that the sample was tested for and a list of all the technicians who reviewed the data and paperwork for this test."

parcel of the internal controls necessary to conduct the NDSL's business.[12]  See Melendez-Diaz, 557 U.S. at 324 ("Business and public records are generally admissible absent confrontation not because they qualify under an exception to the hearsay rules, but because -- having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial -- they are not testimonial.").  Although not every business record is necessarily nontestimonial, see id. at 321; Sweeney, 70 M.J. at 302, the characteristics that distinguish documents prepared "in the course of a regularly conducted business activity" from those prepared "in anticipation of litigation" under M.R.E. 803(6), see United States v. Foerster, 65 M.J. 120, 126 (C.A.A.F. 2007), are also indicative of an administrative purpose rather than an evidentiary purpose.  See id. at 123-26 (holding that a third-party affidavit was both nontestimonial and a business record where (1) it was "made

---

[12] Appellant challenges whether the chain-of-custody documents and the internal review worksheets are testimonial; he does not dispute that they are business records under M.R.E. 803(6).  This is consistent with defense counsel's actions at trial -- defense counsel objected to the admission of the drug testing report on the ground that it violated the Confrontation Clause, not on the ground that it failed to meet the business records exception to the hearsay rule.

at the behest of [the bank]," (2) it "catalog[ed] objective facts," and (3) its primary purpose was "preventing fraud"); cf. Palmer v. Hoffman, 318 U.S. 109, 114 (1943) (holding that an accident report provided by an employee of a railroad company did not qualify as a business record because "[its] primary utility [was] in litigating, not in railroading").

Third, and finally, we observe that the documents at issue lack any indicia of formality or solemnity that, if present, would suggest an evidentiary purpose. See Bullcoming, 131 S. Ct. at 2717 (citing Melendez-Diaz, 557 U.S. at 310-11). Instead, the "statements" we are asked to deem testimonial are comprised of nothing more than signatures, stamped names, dates, and minimal notations with no certification, swearing, witnessing, or other attestation. Cf. Melendez-Diaz, 557 U.S. at 308, 310-11 (concluding that the "certificates of analysis" were "quite plainly affidavits" where they reported the drug type, amount, and "[t]he certificates were sworn to before a notary public by analysts at the State Laboratory Institute of the Massachusetts Department of Public Health, as required under Massachusetts law"); id. at 330 (Thomas, J., concurring) (same). The documents at issue in this case utterly lacked attendant formalities, a characteristic that

stands in stark contrast to the formal, affidavit-like certificates and memoranda at issue in Bullcoming, Melendez-Diaz, Sweeney, and Blazier I, and is -- under Sweeney -- a factor that points to the statements being nontestimonial. 70 M.J. at 303 n.13 (citing Bullcoming, 131 S. Ct. at 2717; Melendez-Diaz, 557 U.S. at 329 (Thomas, J., concurring)).

Based on all of the above, we agree with the NMCCA that none of the statements contained in the chain-of-custody documents and the internal review worksheets at issue are testimonial and that the military judge did not abuse his discretion in admitting them as business records under M.R.E. 803(6).[13]

---

[13] We reiterate that the fact that the government may introduce, subject to M.R.E. 803(6), nontestimonial hearsay via the chain-of-custody documents and internal review worksheets contained in drug testing reports does not preclude an accused from seeking to call as witnesses those who handled the urine specimen and performed the screens, rescreens, and confirmation tests to challenge, among other things, the accuracy, validity, and reliability of the test results. Blazier II, 69 M.J. at 225 n.6 (citing Compulsory Process Clause, U.S. Const. amend. VI; Article 46, UCMJ, 10 U.S.C. § 846 (2006); Rule for Courts-Martial (R.C.M.) 703(a)). Moreover, if Appellant were challenging particular steps in the chain-of-custody or internal review process, as opposed to objecting to the introduction of nontestimonial signatures and notations, the government may choose to establish those challenged steps through live witness testimony, or choose not to at its own peril. See Melendez-Diaz, 557 U.S. at 311 n.1.

B.

In contrast to the statements made in the chain-of-custody documents and internal review worksheets, blocks G and H of the DD Form 2624 were testimonial statements under Sweeney and, therefore, their admission was error. See 70 M.J. at 304 ("[I]t was plain and obvious error to admit the specimen custody document certification. This certification is a formal, affidavit-like statement of evidence."). Therefore, we review for prejudice.[14] Id. at 306.

Relief for Confrontation Clause errors will be granted only where they are not harmless beyond a reasonable doubt. Id. Whether a constitutional error was harmless beyond a reasonable doubt is a question of law reviewed de novo. See United States v. Savala, 70 M.J. 70, 77 (C.A.A.F. 2011). In the context of the erroneous admission of testimonial hearsay, our harmless beyond a reasonable doubt inquiry focuses on whether "'there is a reasonable possibility that the evidence complained of might have contributed to the conviction.'" Blazier II, 69 M.J. at

---

[14] We note that here, unlike in Sweeney, 70 M.J. at 304, Appellant objected to the admission of the drug testing report. Therefore, plain error review is inapplicable. Nevertheless, under Van Arsdall, the erroneous admission of blocks G and H of the DD Form 2624 remains subject to harmless error analysis. 475 U.S. at 684.

226-27 (quoting Chapman v. California, 386 U.S. 18, 23 (1967)).

To determine whether a Confrontation Clause error is harmless beyond a reasonable doubt, this Court has adopted the balancing test established in Van Arsdall, considering such factors as: "[1] the importance of the unconfronted testimony in the prosecution's case, [2] whether that testimony was cumulative, [3] the existence of corroborating evidence, [4] the extent of confrontation permitted, and [5] the strength of the prosecution's case." Sweeney, 70 M.J. at 306 (citing Van Arsdall, 475 U.S. at 684). This list of factors is not exhaustive, and "'[the] determination is made on the basis of the entire record.'" Sweeney, 70 M.J. at 306 (quoting Blazier II, 69 M.J. at 227). To conclude that a Confrontation Clause error was harmless beyond a reasonable doubt, we must be convinced that the testimonial hearsay was unimportant in light of everything else the court members considered on the issue in question. United States v. Gardinier, 67 M.J. 304, 306 (C.A.A.F. 2009).

Applying Van Arsdall, the NMCCA determined that four of the five factors supported the Government's position. Tearman, 70 M.J. at 644-45. Because we agree with the NMCCA and find that any impact the testimonial statements

23

may have had on the panel's findings was de minimis when viewed in light of the entire record of this case, we hold that the error in admitting the testimonial statements -- blocks G and H of the DD Form 2624 -- was harmless beyond a reasonable doubt.

First, the NMCCA determined that the testimonial hearsay "had no bearing on the Government's case" and "was 'unimportant in relation to everything else the [members] considered.'" Id. at 644. Ms. Kaminski, the testifying expert, made only one passing reference to the "THC" notation in block G of the DD Form 2624 and no reference at all to Mr. Romero's certification in block H, "when explaining the basis for her opinion that the appellant's urine sample contained the metabolite THC." Id. Thus, the overwhelming majority of Ms. Kaminski's testimony was squarely within the parameters set by this Court in Blazier I and Blazier II. The record indicates that she reviewed and relied upon the nontestimonial machine-generated data contained in the drug testing report as the basis for her independent conclusion that Appellant's urinalysis indicated a positive result for THC. Further, she properly relied on machine-generated data as the basis for her conclusion that Appellant's urinalysis complied with NDSL procedure and was accurate. See Blazier II, 69 M.J. at

224. Thus, the minimal testimonial hearsay admitted was unimportant to the Government's case when viewed as a whole.

Second, the NMCCA found that the admission of the two testimonial portions of the DD Form 2624 and Ms. Kaminski's reference to block G were cumulative with the rest of Ms. Kaminski's testimony. Tearman, 70 M.J. at 644. Ms. Kaminski repeatedly relied on "[her] reading of [the machine] printout[s]" and "[her] expertise," to reach the conclusion that the specimen tested "above the DoD cutoff." In addition, she relied on her independent knowledge of the drug testing procedures at the NDSL to "offer[] her own conclusions . . . as to the accuracy, reliability, and ultimate result of the tests performed." Id. In this capacity, she testified to matters such as the calibration of the testing machinery, the general reputation of the machinery in the scientific community, and the quality control measures taken during testing.

Third, the testimonial statements in blocks G and H were independently corroborated. Her testimony, which was based on nontestimonial, machine-generated data, corroborated the "THC" notation in block G. For each of the three tests that were run on the urine sample -- the screening test, rescreening test, and GCMS confirmation

test -- Ms. Kaminski indicated that the specimen tested "above the DoD cutoff" based on the "test result[s] and [her] expertise." Similarly, as noted by the NMCCA, Ms. Kaminski was "in charge of the department responsible for the confirmation test, which is required for the NDSL to report a positive test." Tearman, 70 M.J. at 644. With regard to the GCMS confirmation test, Ms. Kaminski testified that: (1) the DoD "sets the cutoff for THC at 15 ng/ml;" (2) "anything 15.0 greater [sic] is considered a positive result;" and (3) the LAN associated with Appellant's sample "tested positive for THC at 37.17 ng/ml." Thus, Ms. Kaminski corroborated Mr. Romero's certification in block H with "her own imprimatur of authenticity and reliability." Id.

Finally, the NMCCA concluded that, "[o]verall, the Government's case was strong." Id. at 645. The evidence suggested "no defects in the collection or chain of custody." Id. And, although Ms. Kaminski could not cure the Confrontation Clause error by serving as a "surrogate witness," see Blazier II, 69 M.J. at 222, 224, she was subject to extensive cross-examination that failed to reveal any weaknesses in the testing process or her

26

conclusions as to the ultimate result of the tests.[15] Moreover, Appellant's primary defense of possible passive marijuana exposure was "dubious," and effectively rebutted by trial counsel during closing argument. Tearman, 70 M.J. at 645 & n.19.

Here, (1) an expert witness, relying on nontestimonial statements, independently and conclusively established the presence of a drug metabolite in an amount above the DoD cutoff level in Appellant's urine, (2) the testimonial hearsay was barely touched on during either the expert's testimony or the Government's case, and (3) any impact of introducing the testimonial hearsay was both cumulative and de minimis. In this context, there is no "reasonable possibility that the evidence complained of might have contributed to the conviction." Chapman, 386 U.S. at 23 (quoting Fahy v. Connecticut, 375 U.S. 85, 86-87 (1963) (internal quotation marks omitted).

---

[15] With respect to the fourth Van Arsdall factor, the NMCCA did note that the declarants of the testimonial portions of the DD Form 2624 did not testify and therefore could not have been cross-examined. Tearman, 70 M.J. at 645. While this factor would weigh against a finding that the admission of the testimonial statements was harmless beyond a reasonable doubt, it is far outweighed by the other four Van Arsdall factors.

## IV.  DECISION

The decision of the United States Navy-Marine Corps Court of Criminal Appeals is affirmed.

United States v. Tearman, No. 12-0313/MC

BAKER, Chief Judge (concurring in part and in the result):

I write separately because I continue to believe that the application of Crawford v. Washington, 541 U.S. 36 (2004), and the line of cases that followed, cannot and should not be resolved without analysis of the distinct features and purposes of the military drug testing program.  A lab report generated as part of an anonymous unit random urinalysis inspection intended to deter drug use and promote military readiness is not the same as a lab report generated from the testing of a single sample by a forensic drug lab for the purpose of prosecution.  As importantly, I do not believe one can resolve this case without first addressing Williams v. Illinois, 132 S. Ct. 2221 (2012).  Williams is the Supreme Court's latest Crawford case.  It was decided after United States v. Sweeney, 70 M.J. 296 (C.A.A.F. 2011), and United States v. Blazier, 69 M.J. 218 (C.A.A.F. 2010), and it narrows the reach of the Supreme Court's prior cases upon which this Court relies.

The Confrontation Clause provides that "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ."  U.S. Const. amend. VI.  At root, the Confrontation Clause bars prosecution on the basis of testimony that is not subject to "the crucible of cross-examination."  Crawford, 541 U.S. at 61.  The Supreme

Court has sought to define what "witness against him" means with respect to out-of-court testimony.  Id. at 51-52.

What the Confrontation Clause means after Crawford in the context of lab reports has proven particularly vexing to the Supreme Court.  See Williams, 132 S. Ct. at 2227 (DNA matching report); Bullcoming v. New Mexico, 131 S. Ct. 2705, 2709 (2011) (blood alcohol analysis); Melendez-Diaz v. Massachusetts, 557 U.S. 305, 320 (2009) (cocaine testing).  As a result, it is not clear what these cases mean or should mean with respect to materials generated as part of the Department of Defense's ongoing random urinalysis program.[1]  That answer depends on how, and whether, one gets to a majority of five on the Supreme Court.  It also depends on which Supreme Court case one cites, and then, which text is applied.  There is persuasive authority to support almost any position.  This elevates the importance of subordinate courts explaining, in context, how and why a particular outcome is reached.

---

[1] See Dep't of Defense Dir. 1010.01, Military Personnel Drug Abuse Testing Program (MPDATP) (Sept. 13, 2012) [hereinafter Dep't of Defense Dir. 1010.01]; Dep't of Defense Dir. 1010.16, Technical Procedures for the Military Personnel Drug Abuse Testing Program (MPDATP) (Oct. 10, 2012); see also Sweeney, 70 M.J. 296; United States v. Blazier (Blazier II), 69 M.J. 218 (C.A.A.F. 2010); United States v. Blazier (Blazier I), 68 M.J. 439 (C.A.A.F. 2010); United States v. Harcrow, 66 M.J. 154 (C.A.A.F. 2008); United States v. Magyari, 63 M.J. 123 (C.A.A.F. 2006).

I.

Williams is the latest Supreme Court case to address the meaning of "testimonial" evidence.  Like prior Court cases, it does not address the military context.  Neither does it address a generalized program of urinalysis inspection that has multiple purposes other than criminal prosecution.  Indeed, the military program in this case addresses, in order of priority, three purposes:  (1) military readiness and fitness; (2) deterrence; and (3) the separation of servicemembers who use drugs.[2]  A court-martial is one possible outcome of a positive test, but it is not listed as a purpose of the program.  In this case, the basis of the test as listed on the form the lab technicians filled-in or reviewed was "random inspection of individuals

---

[2] The MPDATP operates under Dep't of Defense Dir. 1010.01.  Dep't of Defense Dir. 1010.01 mandates three purposes for drug testing:  (1) to "[p]ermit commanders to use drug testing to detect drug abuse and to assess the security, military fitness, readiness, and good order and discipline of their commands"; (2) to deter servicemembers, including those entering active duty, from misusing drugs "including pharmaceutical medications, illegal drugs, and other substances of abuse"; and (3) to "[p]rocess all Service members who knowingly misuse drugs for separation in accordance with applicable Service regulations." Id. at para. 4.b.-d.  The directive notes that the "drug testing program shall enable commanders to take action, adverse or otherwise (including referral for treatment), as appropriate." Id. at para. 4.d.  Specifically, the military requires drug testing of service applicants, new military entrants, reservists, appointees to service academies, Reserve Officer Training Corps cadets, and midshipmen. Id. at encl. 2, para. 1.

within a unit," not for example "probable cause," another
option.[3]

   In the case of the military, for example, the majority of
positive tests result in administrative or nonjudicial response,
not criminal prosecution.[4]  Like any scientific testing system,

---

[3] The primary purpose for testing a sample is written on the DD-2624 next to the Social Security Number of the person who gave the sample.  The DD-2624 is labeled with a code stating the basis of the test:  random inspection of an entire unit (IU), random inspection of individuals within a unit (IR), probable cause (PO), a consent search (VO), rehabilitation (RO), a safety mishap (AO), a command-directed examination (CO), medical (MO), new entrant (NO), or other (OO).  Dep't of Defense Dir. 1010.01 at encl. 2, para. g.  While the directive notes that "[u]rinalysis results may be used as evidence in disciplinary actions under the UCMJ, and in administrative actions (including separation from the Military Service)," id. at encl. 2, para. h.(1), the primary purpose for random inspection, rehabilitation, safety mishap, command direction, medical, or new entrant testing is clearly not criminal prosecution.  While the primary purpose of a "probable cause" or "consent" search may be less clear, those are not present in this case.  Indeed, Appellant's DD-2624 explicitly states next to his Social Security Number that the "Test Basis" is "IR," that is, "random inspection or examination of an individual(s) within a unit." See id. at encl. 2, para. g.(b).

[4] Most positive drug tests do not result in prosecution.  In the fiscal year 2011, 8,988 active duty personnel tested positive for controlled substances.  Office of the Under Secretary of Defense for Personnel and Readiness, Status of Drug Use in the Department of Defense Personnel:  Fiscal Year 2011 Drug Testing Statistical Report at 8.  In the same year, there were 4,898 courts-martial (including general, special, and summary courts-martial) across the four services and for all offenses.  Annual Report Pursuant to the Uniform Code of Military Justice for the Period of October 1, 2010 to September 30, 2011, sec. 3, app. at 21, sec. 4, app. at 24, sec. 5, app., sec. 6, app. A (2012), reprinted in 70 M.J. CXI, CXXVIII, CLVIII, CLXVI (2012).  While at least the Navy collects quarterly reports on drug prosecutions, see Dep't of the Navy, Naval Service Training

4

the urinalysis program is designed to identify and safeguard against false positives. This is a critical function tied directly to good order and discipline and unit morale. Where entire units are randomly inspected for drug use, the quality and redundancy of the safeguards to avoid mistakes are thus critical not only to the scientific process, but to military readiness. It follows that the more accountable a random urinalysis process is, the greater the confidence service personnel will have in the outcomes generated by the random inspections in which they are required to participate.

The Supreme Court's case law has not addressed the distinctions in lab process and testing that the military's random drug screening program presents. See Sweeney, 70 M.J. at 309-13 (Baker, J., joined by Stucky, J., concurring in part and dissenting in part). This Court has not sought to fill in these contextual differences and blanks. To the contrary, each of the Supreme Court's lab cases is addressed to a single specific lab

Command Inst. 5800.1A, encl. (1): Quarterly Criminal Activity Feeder Report of Disciplinary Infractions and Courts-Martial (May 16, 2012), these reports apparently are not publicly available. However, even without the precise statistics, it is clear that even if drug prosecutions were the sole crime charged in courts-martial in fiscal year 2011, then only about half of the personnel who tested positive were charged. Obviously, since drug crimes make up only a small percentage of courts-martial charges, the actual percentage of positive drug tests that are used in criminal prosecution is much lower. See also Sweeney, 70 M.J. at 309-11 (Baker, C.J., joined by Stucky, J., concurring in part and dissenting in part).

test, involving a specific identified crime, where criminal prosecution is the purpose of the report.  See Williams, 132 S. Ct. at 2227 (DNA match report in rape prosecution); Bullcoming, 131 S. Ct. at 2709 (blood alcohol analysis in DWI prosecution); Melendez-Diaz, 557 U.S. at 320 (cocaine testing in drug distribution prosecution).  As Justice Sotomayor noted in her controlling[5] concurrence in Bullcoming, the Supreme Court's cases dealt with statements which had "'a primary purpose of creating an out-of-court substitute for trial testimony,'" 131 S. Ct. at 2720 (quoting Michigan v. Bryant, 131 S. Ct. 1143, 1155 (2011)), and not lab testing situations in which the state "suggested an alternate purpose, much less an alternate primary purpose, for the" lab report, id. at 2722.

Williams is the latest Supreme Court opinion to address the meaning of the Confrontation Clause after Crawford.  As a result, it warrants more than passing citation in the majority opinion, especially since it expressly delimits the Supreme Court's prior cases on which this Court relies.  See Williams, 132 S. Ct. at 2242-43.  It is the most important of the Supreme

---

[5] See Marks v. United States, 430 U.S. 188, 193 (1977) ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds . . . .'" (alteration in original) (quoting Gregg v. Georgia, 428 U.S. 153, 169 n.15 (1976))).

Court's post-Crawford cases, because it appears to go furthest in attempting to wrestle with the ambiguities that remain after Crawford. It was also decided after Sweeney and Blazier.

The conflicting opinions in Williams support a variety of standards for "testimonial" evidence. As illustration, one can extract the following statements from Williams:

> The abuses that the Court has identified as prompting adoption of the Confrontation Clause shared the following two characteristics: (a) they involved out-of-court statements having the primary purpose of accusing the targeted individual of engaging in criminal conduct and (b) they involved formalized statements such as affidavits, depositions, prior testimony, or confessions.

132 S. Ct. at 2242. Williams later notes an alternate standard regarding primary purpose that does not consider the formality of the statement. See id. at 2243 ("[I]f a statement is not made for 'the primary purpose of creating an out-of-court substitute for trial testimony,' its admissibility 'is the concern of state and federal rules of evidence, not the Confrontation Clause.'"). In his concurrence, Justice Breyer emphasized the distinct nature of professional scientific analysis:

> [T]he employees who contributed to the report's findings were professional analysts working on technical matters at a certified laboratory; and the employees operated behind a veil of ignorance that likely prevented them from knowing the identity of the defendant in this case. Statements of this kind fall within a hearsay exception that has constituted an important part of the law of evidence for decades. . . . [S]uch statements also presumptively fall

outside the category of "testimonial" statements that the Confrontation Clause makes inadmissible.

Id. at 2249 (Breyer, J., concurring).  Justice Thomas, concurring in the judgment, argued that formality, not purpose, was the touchstone of the Confrontation Clause:

[T]he Confrontation Clause regulates only the use of statements bearing "indicia of solemnity."  This test comports with history because solemnity marked the practices that the Confrontation Clause was designed to eliminate, namely the ex parte examination of witnesses under the English bail and committal statutes during the reign of Queen Mary. . . . [T]he Confrontation Clause reaches "formalized testimonial materials," such as depositions, affidavits, and prior testimony, or statements resulting from "formalized dialogue," such as custodial interrogation.

Id. at 2259-60 (Thomas, J. concurring in the judgment) (internal citations omitted).  Justice Kagan's dissent suggested a broader "available for use at a later trial" standard for "testimonial" evidence:

[T]he [Confrontation] Clause's "core class of testimonial statements" . . . [include statements] "made under circumstances which would lead an objective witness reasonably to believe that [they] would be available for use at a later trial.". . .

. . . "[T]he accused's right is to be confronted with" the actual analyst . . . .

. . . [T]he report was made to establish "'some fact' in a criminal proceeding."

Id. at 2266 (Kagan, J., with whom Scalia, J., Ginsburg, J., and Sotomayor, J., joined, dissenting) (third bracket in original). However, the Williams dissent also favorably cited a primary

purpose test, though it was distinct from the primary purpose test of the plurality.  See id. at 2273 ("We have previously asked whether a statement was made for the primary purpose of establishing 'past events potentially relevant to later criminal prosecution'-- in other words, for the purpose of providing evidence.") (quoting Davis v. Washington, 547 U.S. 813, 822 (2006))).

From these statements three different tests emerge for determining whether lab material is testimonial:  (1) a "primary purpose" test, which considers the historical reasons for adoption of the Confrontation Clause including the use of out-of-court statements (often extracted under duress) to convict persons in court (often of treason) without the opportunity to question the witness or test the veracity of the statements, and which asks whether the primary purpose for generating the out-of-court statement or data was for criminal prosecution; (2) a stylistic test, which looks to the form and solemnity of the out-of-court statement, rather than its purpose, to determine if it is "testimonial"; and, (3) a literal test, which considers any statement brought into a trial, including some but apparently not all lab notations, to be subject to cross-examination if the maker of the statement could reasonably have contemplated the possibility of prosecution.

A majority of courts interpreting Crawford after Williams have adopted a purpose-based test, reflecting analysis of both the historical purposes behind the Confrontation Clause as well as the primary purpose for the particular lab report (statement) at issue. See, e.g., United States v. Cameron, 699 F.3d 621, 640 (1st Cir. 2012) ("To rank as 'testimonial,' a statement must have a 'primary purpose' of 'establishing or proving past events potentially relevant to later criminal prosecution.'" (quoting Bullcoming, 131 S. Ct. at 2714 n.6)); United States v. Polidore, 690 F.3d 705, 711-12, 716-18 (5th Cir. 2012) ("Although it does appear that the declarant contemplated that his call could lead to a later criminal prosecution, he was not making his statements to establish or prove past events potentially relevant to later criminal prosecution.") (internal quotation marks omitted); Brown v. Epps, 686 F.3d 281, 287 (5th Cir. 2012) ("[A] statement is not testimonial if it is procured under . . . circumstances where the primary purpose is not to create an out-of-court substitute for trial testimony."); United States v. Sedillo, No. 11-2237, 2013 U.S. App. LEXIS 2167, *41-*42, 2013 WL 363469, at *14 (10th Cir. Jan. 31, 2013) (Brisco, C.J., dissenting) (distinguishing Williams from case in which "[t]he primary purpose of the DNA test was to accuse a targeted individual and to create evidence for use at trial," and in which the lab analyst knew that if the results were inculpatory,

they would be used against this particular defendant at trial). Several courts have adopted a joint solemnity–primary purpose test.  See, e.g., People v. Lopez, 55 Cal. 4th 569, 581-82 (Cal. 2012) (to be testimonial, a statement "must have been made with some degree of formality or solemnity," and its "primary purpose [must] pertai[n] in some fashion to a criminal prosecution"); People v. Dungo, 55 Cal. 4th 608, 620 n.5 (Cal. 2012) ("But formality is not enough to make an extrajudicial statement testimonial; the statement must also have a primary purpose pertaining to the investigation and prosecution of a crime."); see also Dungo, 55 Cal. 4th at 628-30 (Chin, J., concurring) (asserting that, after Williams, a statement is only testimonial if it meets both the solemnity and primary purpose tests); People v. Leech, 980 N.E.2d 570 (Ill. 2012) ("[W]e conclude that under the objective test set out by the plurality in Williams, under the test adopted in Davis, and under Justice Thomas's 'formality and solemnity' rule, autopsy reports prepared by a medical examiner's office in the normal course of its duties are nontestimonial.").  Other courts have adopted a literal test, as endorsed by the majority opinion in this case.[6]  See, e.g.,

---

[6] Other courts have favorably cited the "available for use at a later trial" test, but have understood it in the context of a "primary purpose" test.  See, e.g., People v. Nunley, 821 N.W.2d 642, 655 n.77 (Mich. 2012) (While asserting that its "analysis is consistent with the reasoning of both the lead opinion and the dissenting opinion" in Williams, the Michigan Supreme Court

United States v. Pablo, 696 F.3d 1280, 1287, 1289 (10th Cir. 2012) ("A testimonial statement is a statement that a reasonable person in the position of the declarant would objectively foresee might be used in the investigation or prosecution of a crime. . . . [G]iven the facts of this case and the plain-error posture of our review, we need not decide the precise mandates and limits of Williams, to the extent they exist.).

No court has addressed a context like that in the military, where multiple tests are conducted at once on numerous anonymous samples for the purpose of military readiness and deterrence and where the procedures are intended to safeguard against false positives in a demonstrable and accountable way in part to support military morale. To the contrary, all of these post-

---

found that "the primary purpose of the certificate of mailing was not to accuse a targeted individual of engaging in criminal conduct" and that "the circumstances here would not lead an objective witness to reasonably believe that the certificate of mailing would be available for use at a later trial" because no crime had yet been committed or investigation started.); State v. Kennedy, 735 S.E. 2d 905, 915 (W. Va. 2012) (alteration in original) ("The primary purpose test states that a statement is testimonial if the primary purpose . . . is to establish or prove past events potentially relevant to later criminal prosecution. Since that time, the United States Supreme Court has reiterated that the primary purpose test focuses the inquiry on whether the evidence was for the purpose of establishing or proving some fact at trial. Consistent with these decisions, this Court has adopted the following iteration of the primary purpose test to determine if a statement is testimonial: . . . [A] testimonial statement is, generally, a statement that is made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.") (citations and internal quotation marks omitted).

Williams cases involve singular tests for specific criminal law investigations, whether to identify a specific culprit for prosecution (as in Williams), or to prove that a particular suspect is guilty, cf. Melendez-Diaz, 557 U.S. at 319-20 (proving that the white powdery substance possessed by suspected drug dealer was cocaine); Bullcoming, 131 S. Ct. at 2709-11 (proving that the blood alcohol content in the suspected drunk driver was above legal limits). Which line of reasoning one selects from Williams is outcome determinative in different directions. It is easy to see, for example, how the application of the "solemnity" test might cover a statement with the word "certify" in it. It is also easy to see how a primary purpose test would lead to an opposite result in a lab report documenting in an objective manner all the results from a random unit sweep. Less certain is how the "would be available for use at a later trial" or literal standard would apply especially where Williams appears to dramatically narrow this earlier language from Crawford.[7]

---

[7] Williams considerably narrows the Supreme Court's previous language, previously adopted by this Court, that "a statement is testimonial if 'made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.'" Sweeney, 70 M.J. at 301 (quoting Crawford, 541 U.S. at 51-52). In this context, it may be worth noting that Crawford did not explicitly adopt the "available for use at a later trial," standard, but rather merely articulated it as one possible formulation among many, and specifically noted that this was the formulation suggested

I do not fault the majority for adopting a rule. Blazier I, 68 M.J. 439, adopts a clear rule with respect to a cover document that is specifically produced for prosecuting a particular person in a criminal proceeding. Id. at 443-43 (cover memorandum, which was produced "for court-martial use" after accused's samples "tested positive for illegal substances" and which detailed the drug tests and summarized the results, was "clearly testimonial"); see also Blazier II, 69 M.J. at 224 (cross-examination of "laboratory certifying official" familiar with lab procedures but who did not take part in testing did not satisfy the right to confront the authors of the cover memorandum). The rule has to be set somewhere, and there is value in establishing a rule and sticking with it.

My trouble is with the treatment of the DD-2624 Specimen Custody Form, and by implication all the other standard chain-of-custody documents, after Williams. One can see how each of

by the brief for the National Association of Criminal Defense Lawyers. See Blazier I, 68 M.J. at 442. Similarly, Melendez-Diaz noted the "available for use at a later trial" standard as one of several possible formulations, 557 U.S. at 310 (quoting Crawford, 541 U.S. at 51-52), but noted that the affidavits in Melendez-Diaz "not only" would meet the "available for use at a later trial" standard, but in fact had the "sole purpose" of providing evidence at trial. Id. at 311. Thus it appears that the Supreme Court never adopted the "available for use at a later trial" language as the definitive standard for evidence implicating the Confrontation Clause, regardless of what the Williams dissent suggests, see 132 S. Ct. at 2266 (Kagan, J., with whom Scalia, J., Ginsburg, J., and Sotomayor, J., joined, dissenting).

14

the legal statements taken from Williams might result in the exclusion or inclusion of each line of the DD-2624. The majority does not explain how or why Williams applies, or more to the point, why it doesn't apply. Nor does the majority explain how we have gotten from Lord Cobham and the dungeons below the Tower of London, see Crawford, 541 U.S. at 44, to the recording of lab results at the Brooks Army Medical Lab in determining what is testimonial or determining what it means to bear witness against someone in the context of unit inspections.

There is an argument, for example, that none of the material on the form DD-2624 is testimonial, because it is not composed of the sort of out-of-court statements against which the Confrontation Clause was intended to protect and the primary purpose of the statements is directed toward military readiness and not criminal prosecution. There is a separate and equally valid argument that Block H is testimonial because the word "certification" is used in validating the results and process. Thus, this block satisfies the solemnity requirement of Justice Thomas. See Williams, 132 S. Ct. at 2259-60 (Thomas, J., concurring in the judgment) (fifth vote concurrence). But that does not explain the inclusion of Block G, which merely records a lab result in a dispassionate objective manner. Moreover, if Block G is testimonial, which it would appear to be based on Sweeney, see 70 M.J. at 301 ("[A] statement is testimonial if

15

'made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.'" (quoting Blazier I, 68 M.J. at 442)), but not Williams, then it is not clear why all the results and data compiled by the lab technicians at Brooks, or for that matter all the chain-of-custody signatures, are not also testimonial. As Justice Breyer notes in Williams, "[o]nce one abandons the traditional rule, there would seem often to be no logical stopping place between requiring the prosecution to call as a witness one of the other laboratory experts who worked on the matter and requiring the prosecution to call all of the laboratory experts who did so." 132 S. Ct. at 2246 (Breyer, J., concurring). The line of demarcation for Block H is clear to the extent it is based on the word "certify." But it is not clear why some neutral and objective entries are testimonial and others are not.

The application of the Confrontation Clause to lab data and custody reports generated pursuant to the military's random urinalysis program seems random. The person who certifies that lab procedures were followed is providing out-of-court testimony, but the persons who sign the "quality control review" sheet and the "final laboratory certifying official review"

sheet[8] are not doing so.  The person who indicates that the sample being tested belongs to Appellant[9] is not "testifying," but the person who indicates that the data recorded represents THC is testifying, and all in a context where prosecution is only one possible outcome of a positive test and, by percentage, the least likely.  Cf. Melendez-Diaz, 557 U.S. at 335-36 (Kennedy, J., with whom Roberts, C.J., Breyer, J., and Alito, J., joined, dissenting) (noting the inconsistent applications of the testimonial standard).

## II.

In the end, it may not make a difference which parts of which Defense Department urinalysis lab report are testimonial. In light of the first holding in Williams regarding the admission of expert testimony and this Court's unanimous view in this case, that so long as an expert lab supervisor testifies and draws his or her own independent conclusion from the lab reports, any Confrontation Clause error is presumptively harmless beyond a reasonable doubt.  Cf. Bullcoming, 131 S. Ct. at 2722 (Sotomayor, J., concurring in part) ("[T]his is not a

---

[8] Technicians sign quality review sheets, give signatures indicating that the batch was dumped, and make notations regarding the pouring of samples and the GC-MS autotune (calibration).

[9] The lab technician who attaches bar code stickers to the GC-MS injector worksheet, so that the GC-MS knows what sample is associated with what number, apparently does not sign.

case in which the person testifying is a supervisor, reviewer, or someone else with a personal, albeit limited, connection to the scientific test at issue. . . . It would be a different case if, for example, a supervisor who observed an analyst conducting a test testified about the results or a report about such results.").

But it should matter. We should get the law right, which every judge on this Court is assuredly trying to do. It also seems peculiar, if not cynical, for the military to prosecute urinalysis cases based on evidence this Court has now determined is constitutionally inadmissible, but nonetheless harmless beyond a reasonable doubt. That cannot contribute to confidence in the urinalysis program or the military justice system generally.

We should also consider the effect of our decisions on military readiness and morale. Is it clear what needs to change in the random urinalysis process in order to conduct the program in a manner consistent with this Court's application of Crawford? Is it possible to build in redundant and accountable checks on the process of random urinalysis inspections so as to assure servicemembers they will not be falsely identified for using drugs, without also necessitating the production of multiple Crawford witnesses at trial? Or will this continue to

be litigated and resolved on a case-by-case, line-by-line basis? These questions are as important as they are rhetorical.

Unless we are constitutionally compelled to conclude that a person who validates the chain of custody, objectively records lab data, or validates the process used for a random urinalysis sweep is a witness for the purposes of the Confrontation Clause, I would not adopt such a literal rule. Such a rule is not needed to protect the confrontation rights of the accused, who under any Crawford theory or test remains free to call witnesses that are needed and constitutionally necessary to put on a defense. Such a rule could discourage accountability, which increases the likelihood of false positives and mistakes. See Williams, 132 S. Ct. at 2251 (Breyer, J., concurring). Such a rule would incentivize limiting the number of lab statements and lab technicians so as to avoid the "solemnity" of a document and would result in a process with fewer accountable checks and certifications. Alternatively, prosecutors might decline to introduce lab data at all, and rely exclusively on expert testimony. This might have the detrimental effect of eliminating the presence of empirical, testable scientific reports altogether, and turning a urinalysis trial into an opaque presentation of a scientist instructing the members to accept that the accused is guilty. See Williams, 132 S. Ct. at 2267-77 (Kagan, J., with whom Scalia, J., Ginsburg, J., and

Sotomayor, joined, dissenting) (looking to formality alone "grants constitutional significance to minutia, in a way that can only undermine the Confrontation Clause's protections"); Crawford, 541 U.S. at 52, n.3 ("We find it implausible that a provision which concededly condemned trial by sworn ex parte affidavit thought trial by unsworn ex parte affidavit perfectly OK"). Moreover, in the unique military context, presentation of the complete urinalysis process allows members to validate a program which they themselves are subject to. Alternatively, courts-martial will be left to continue litigating each entry and each block of each form going forward leading to inconsistent rulings. The majority's rule will also certainly lead to inconsistent application of the law. Different commanders will differently weigh the needs of military readiness against the leadership, administrative, nonjudicial, and prosecutorial choices that they will face after a positive urinalysis test. From my perspective, Supreme Court case law does not address this military context, and neither the text of the Constitution nor case law dictates this result.

For these reasons, I concur in the result and in the analysis regarding the introduction of Ms. Kaminski's expert testimony, but do not join the analysis with respect to the DOD Form DD-2624 or note 6, which in my view, should address the distinct military context presented by a random urinalysis

inspection as well as Williams, the Supreme Court's latest

Crawford case.